IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

ROBERT H. WILKES, JR.,

            Plaintiff,

    vs.                        **Case No. 06-4007-RDR**

MICHAEL J. ASTRUE,
Commissioner of Social
Security,
            Defendant.

_____

### MEMORANDUM AND ORDER

Plaintiff has filed an application for supplemental security income benefits pursuant to the Social Security Act alleging an onset date of disability of June 5, 2000.  An administrative hearing was conducted by an Administrative Law Judge (ALJ) on March 19, 2004.  On May 17, 2004 the ALJ issued a favorable decision finding the plaintiff to have been disabled since August 14, 2001. Defendant requested a review by the Appeals Council.  The Appeals Council reversed the decision of the ALJ and remanded the case for further proceedings.  A second hearing before a different ALJ was conducted on March 10, 2005.  The ALJ issued a decision on March 21, 2005 finding that plaintiff was not disabled.  Defendant has adopted the decision to deny benefits.  This case is now before the court to review defendant's decision.

STANDARD OF REVIEW

The court reviews defendant's decision to determine whether the decision was supported by substantial evidence and whether the

correct legal standards were applied.  <u>Glenn v. Shalala</u>, 21 F.3d 983, 984 (10th Cir. 1994).  Substantial evidence is such evidence that a reasonable mind might accept to support the conclusion. <u>Rebeck v. Barnhart</u>, 317 F.Supp.2d 1263, 1271 (D.Kan. 2004) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  The court must examine the record as a whole, including whatever in the record fairly detracts from the weight of the defendant's decision, and on that basis decide if substantial evidence supports the defendant's decision.  <u>Glenn</u>, 21 F.3d at 984.

ALJ DECISION (Tr. 20-30).

The ALJ's decision followed the five-step evaluation process used in these cases:  1) is the claimant engaging in substantial gainful activity; 2) does the claimant have severe impairments; 3) does the impairment or combination of impairments meet or equal an impairment listed in Appendix 1 to subpart P of part 404; 4) does the impairment or combination of impairments prevent the claimant from doing past relevant work; 5) does the impairment or combination of impairments prevent the claimant from doing other work that exists in significant numbers in the national economy. See 20 C.F.R. § 416.920(a)(4)(i)-(v).

The ALJ found that plaintiff has not engaged in substantial gainful activity since June 5, 2000.  He determined that plaintiff has several severe impairments:  a back injury; carpal tunnel syndrome, post release; diabetes; and bipolar disorder.  He found,

however, that plaintiff did not have an impairment or combination of impairments which met the criteria of a disabling impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  He held that plaintiff could not:  lift or carry more than 10 pounds; stand or walk more than two hours out of a total of eight; or sit for more than six hours out of a total of eight.  He found that plaintiff had an unlimited ability to push or pull but that he could only occasionally finger and handle objects.  He stated in his findings that plaintiff should avoid concentrated exposure to vibration and that plaintiff could only occasionally stoop, crouch, kneel and crawl.  The ALJ also held that plaintiff should have limited contact with the public.  The ALJ found that plaintiff had no history of past relevant work and that he had no work skills which were transferable to semi-skilled or skilled employment. Nevertheless, the ALJ determined that plaintiff would be able to engage in work which existed in significant numbers in the local and national economies.  The only example given for such work in the ALJ's decision was the job of surveillance system monitor.

PLAINTIFF'S ARGUMENTS

Treating physicians

Plaintiff's first argument is that the ALJ did not properly evaluate the opinions of plaintiff's treating physicians, Dr. Stewart Grote and Dr. Gordon Risk.

Dr. Grote wrote on April 4, 2001:

3

Robert Wilkes was injured in June 2000 in a lifting injury when his co-workers let a heavy object slip that he was holding. He basically wrenched his upper back and long after that he had symptoms down his right arm of numbness and tingling. . . . Since that time, he has subsequently had complete workup for cervical and thoracic disc disease with negative MRI scans. The patient however has been unable to go back to work in his heavy duty job because of persistent pain. In fact, he has been essentially sedentary after a few attempts to return to work last summer over the last 8 months. He has also had continued pain requiring narcotics for treatment and has basically failed physical therapy and does respond temporarily to trigger point injections. He is now undergoing epidural blocks and in fact, just yesterday, the 3rd of April, he was treated with local injections after he injured his back with acute lumbar spasms while attempting to do some motor work on his car. The patient does have significant limitations in doing any type of physical duty. The patient can do sedentary or clerical duty despite his persistent pain but is limited in those duties because of his lack of computer skills. He does have some horticultural training and applied for several jobs in this absence from work in the last few months. He basically cannot lift anything heavier than 10 pounds and has great difficulty in reaching above his head at any time. He cannot walk for great distances and sitting for prolonged times greater than 15 minutes also increases his lower and upper back pain.

(Tr. 194).

Dr. Grote wrote on August 3, 2004:

Patient has failed multiple pain treatments and is only palliated on oxycontin. He has also tried to use multiple meds for [bipolar disorder]. Patient is not fit for sedentary duty due to lack of training and his uncontrolled manic depression.

(Tr. 397).

Dr. Grote wrote on March 9, 2005:

I have been treating Robert Wilkes for the past several years. During the course of his treatment he has suffered from chronic pain syndrome with neck and upper

4

back pain, diabetes mellitus, manic depression and other ailments that have made him unable to return to his work as a carpenter. In addition, I feel in my professional opinion that Mr. Wilkes may not be able to work at any job, including light or sedentary work, due to his lack of concentration, and his full range of sedentary work has been severely limited due to his nonexertional limitations. This opinion has been formulated over several years and numerous visits and examinations in my office.

(Tr. 426).

Dr. Grote also mentioned in a progress note on April 10, 2002 that plaintiff was completely disabled. (Tr. 378).

Dr. Risk wrote on August 4, 2004:

I have treated Robert Wilkes for a bipolar disorder, mixed type, and a panic disorder with agoraphobia at Wyandot Center since 2-26-02. His Hepatitis C and diabetes have made treatment a challenge, since a number of medications cannot be used as a consequence of his medical conditions. I understand that his credibility has recently been challenged, but in my experience he has been a reliable reporter and has worked cooperatively in treatment to expand his capabilities. His mood nevertheless remains unstable, and his panic disorder makes it extremely difficult to enter new situations. He is quite comfortable working around the home, but new situations stir up paranoia and impair his ability to concentrate and to work cooperatively with others. He is easily stirred to anger by anyone outside the family. I am currently treating him with a combination of Lamictal and Alprazolam, both medications indicated for the treatment of his psychiatric conditions. I think his psychiatric illnesses prevent him from working full-time at the present and that these limitations have been present throughout the time I have known him.

(Tr. 398).

The Tenth Circuit discussed how treating physicians' opinions are considered in social security cases in Langley v. Barnhart, 373 F.3d 1116, 1119 (10th Cir. 2004):

According to what has come to be known as the treating physician rule, the Commissioner will generally give more weight to medical opinions from treating sources than those from non-treating sources. 20 C.F.R. § 404.1527(d)(2). "In deciding how much weight to give a treating source opinion, an ALJ must first determine whether the opinion qualifies for 'controlling weight.'" <u>Watkins v. Barnhart</u>, 350 F.3d 1297, 1300 (10th Cir. 2003). To make this determination, the ALJ:

> must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

<u>Id</u>. (quotations omitted); <u>see also</u> § 404.1527(d)(2).

Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§] 404.1527.'" <u>Id</u>. (quoting Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4).

> Those factors are:
> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

<u>Id</u>. at 1301 (quotation omitted).

"Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons . . . for the

weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." <u>Id</u>. at 1300 (quotations omitted). "[I]f the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." <u>Id</u>. at 1301 (quotations omitted).

The ALJ gave "little weight" to the opinions of Dr. Grote and Dr. Risk because he believed they were "conclusory" and they were not supported or were inconsistent with the results of laboratory and diagnostic tests and the physicians' treatment notes. (Tr. 28). The ALJ noted that Dr. Grote remarked at times that plaintiff's pain was controlled by pain medication and that Dr. Risk remarked that plaintiff's mental status exams were "essentially normal." (Tr. 28). The ALJ also commented that Dr. Grote stated that plaintiff "may be abusing pain medication." (Tr. 28).

The court has attempted to review the record carefully. By the court's count, the record reflects approximately 71 patient visits to either Dr. Grote or another doctor acting for Dr. Grote. The notes for approximately 52 visits make reference to chronic back pain or chronic pain syndrome or back strain. Throughout the years of visits shown in the record, from June 2000 through February 2005, plaintiff has been prescribed strong pain medication and undergone treatment such as physical therapy and epidural blocks to attempt to mitigate his pain. The pain has been corroborated through physical examinations. Although there is no

7

injury shown by an MRI or a scan of plaintiff's spine, the court believes that Dr. Grote's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Therefore, it should qualify for controlling weight.

Even if the opinion did not deserve controlling weight, it certainly warranted great deference. Dr. Grote had a lengthy history with plaintiff which involved a multitude of examinations that related specifically to plaintiff's back pain and other physical ailments. His opinion appears supported by the medical evidence in the record, including plaintiff's prescription drug history and attempts at physical therapy. It also appears consistent with plaintiff's work history and daily activities. The ALJ essentially speculates that plaintiff may be abusing his prescription medication. But, the court's review of the record and plaintiff's long history on that medication do not support the ALJ's speculation or decrease the support in the record for Dr. Grote's opinion. Indeed, the limits the ALJ placed upon plaintiff's residual functional capacity suggest that the ALJ did give Dr. Grote's opinion substantial weight. The only limitation which Dr. Grote described that the ALJ plainly did not accept was that plaintiff needed to rest for 4 or 5 hours out of an eight-hour workday. The ALJ did not explain, however, why the other limitations were mostly credible, but the hours of rest were not. Counsel for defendant argued that the hours of rest were not

supported by any treatment note from Dr. Grote recommending that plaintiff rest 4 or 5 hours a day. We do not find this argument persuasive for two reasons. First, the ALJ did not rely upon this reason to dispute Dr. Grote's conclusion and this court may not adopt post-hoc rationalizations to support an ALJ's decision that are not apparent from the decision itself. Haga v. Astrue, 482 F.3d 1205, 1207-08 (10th Cir. 2007). Second, lying down to rest is not a treatment per se for a chronic condition, instead it seems more like an observed or predicted limitation upon plaintiff's functional capacity. This may explain why it is not part of a treatment note.

The ALJ also asserts that Dr. Grote's conclusions are contradicted by the references in the record showing that plaintiff's pain was under control. There are several references of that kind: pain medications "have been working for him" (Tr. 417); "doing well" but still has lots of pain (Tr. 420); "doing fairly well" (Tr. 400); "doing well" with pain control on large doses of oxycontin (Tr. 367); "doing fairly well" on oxycontin with chronic pain (Tr. 372); "doing well" on oxycontin, pain under control (Tr. 306); oxycontin helps significantly (Tr. 196); oxycontin controlling pain "quite nicely" (Tr. 198). It is clear from Dr. Grote's previous statements set forth in this opinion that "doing well" or "fairly well" in his notes did not mean that he believed plaintiff was able to perform many or any kinds of gainful

employment, even with pain medication.  For instance, in January of 2002, Dr. Grote wrote in a progress note that plaintiff was "doing well" on oxycontin. (Tr. 382).  But in April 2002, he said plaintiff was "completely disabled" (Tr. 378), and in May 2002 he said it was amazing that plaintiff's disability claim was denied. (Tr. 374).  Plaintiff's pain has been controlled by oxycontin, but not to the degree that would permit him to work.  That is Dr. Grote's opinion.  We do not believe the treatment notes, which also reflect plaintiff's desire to work and unsuccessful attempts to work, are so inconsistent with Dr. Grote's opinions that the opinions should be rejected.

Dr. Risk, a board certified psychiatrist who had treated plaintiff for two and one-half years, gave an opinion on August 2, 2004 that plaintiff's psychiatric illnesses prevented him from working full-time and that these limitations have been present throughout his history with Dr. Risk.  The ALJ discounted this opinion because he found it inconsistent with Dr. Risk's mental status exams and his treatment notes.  The ALJ did not disagree, however, that plaintiff suffers from bipolar disorder.

During plaintiff's initial evaluation by Dr. Risk, the doctor observed that plaintiff was depressed, experienced racing thoughts, and was easily agitated. (Tr. 331).  On March 6, 2002 plaintiff reported that he was "fairly wired all night" on the medication that was prescribed. (Tr. 330).  He tried lithium to stabilize his

mood but discontinued that drug because it caused him to have tremors. Plaintiff said, on March 25, 2002, that he was calm and that his mood was stable on a different drug (Algrazolam) and that his primary care physician had commented on his newfound calmness. (Tr. 327). His good results with this drug continued into April 2002. (Tr. 327). On May 10, 2002 the doctor noted that plaintiff was taking too much Algrazolam and that he was having racing thoughts. A new drug, Depakote, was proposed. This had a beneficial impact upon plaintiff's sleep. (Tr. 326). On July 2, 2002 plaintiff reported that he was "doing fine," sleeping well, had no angry outbursts, and was stable on his medication. (Tr. 325). On July 18, 2002 plaintiff was reported to have anxiety. (Tr. 330). On September 12, 2002 plaintiff was said to have good control of symptoms on his medication. (Tr. 324). The symptoms were also reported under control during a visit on November 6, 2002. (Tr. 323). In January 2003 plaintiff was "doing better," sleeping "ok" and his mood was "better". (Tr. 323). But, in February 2003, he was struggling with feelings of hopelessness and depression, although he thought his medicines were working. (Tr. 322). In April 2003 it was noted that "in general" plaintiff had good symptom control on his medications. (Tr. 322). Plaintiff's mood was "okay" or "euthymic" during a visit on March 24, 2004.

(Tr. 405).[1]  He was "irritable" on June 8, 2004. (Tr. 406).  On
August 3, 2004 plaintiff reported that he had not slept in five
days and was quite irritable with his family.  The doctor reported
that plaintiff was anxious and agitated, but his mood was labeled
"euthymic." (Tr. 407).  A new drug, Lamictal, was started. (Tr.
407).  On August 31, 2004 plaintiff was said to have a "good
response" to Lamictal.  He was less irritable and more calm.  His
mood was listed as "euthymic." (Tr. 410).  On December 6, 2004
plaintiff was reported to be "more irritable" and his mood was
labeled as "hypomanic." (Tr. 411).  Plaintiff was restarted on
Lamictal and had a good response reported on January 25, 2005.  He
was able to maintain his composure and his mood was again listed as
"euthymic." (Tr. 412).

     The court does not believe the ALJ's reference to the
treatment notes justifies his rejection of Dr. Risk's opinion that
new situations would stir up paranoia and impair plaintiff's
ability to concentrate and work cooperatively with others.
Plaintiff's visits to the doctor were not new situations by 2003 or
2004.  Nor does it appear that he faced many new situations, at
least in the field of employment, while he was treated by Dr. Risk.
Therefore, it seems inappropriate for the ALJ to draw conclusions
from the treatment notes which are different from the conclusions

---

     [1] We take "euthymic" to mean "tranquil."  See Sultan v.
Barnhart, 368 F.3d 857, 861 n. 2 (8th Cir. 2004).

drawn by his treating physician.  See <u>Morales v. Apfel</u>, 225 F.3d 310, 319 (3rd Cir. 2000) (treating psychiatric physician's opinion should not be rejected on the basis of treatment records reporting on the claimant in an environment absent of workplace stresses).

Counsel for defendant makes reference to an alleged contrary opinion by Dr. Risk on April 22, 2002.  This document was not mentioned by the ALJ and it appears to the court that the document on April 22, 2002 was not produced by Dr. Risk but by a reviewing physician. (Tr. 336).   Dr. Risk's opinion warrants greater deference than the opinion of a reviewing physician.  In any case, the court cannot affirm the decision of the ALJ on the basis of an argument or evidence which the ALJ does not rely upon to support his decision.  <u>Haga</u>, 482 F.3d at 1207-08.

<u>Residual functional capacity</u>

Plaintiff argues that the ALJ did not properly assess plaintiff's residual functional capacity (RFC).  In particular, plaintiff contends that the ALJ erred by not considering plaintiff's alleged need to lie down for significant time periods each day or plaintiff's difficulties with new situations, concentration and working cooperatively with others in evaluating plaintiff's RFC.

In this case, the ALJ made some specific findings as to plaintiff's RFC. (Tr. 28 & 30).  These findings, however, do not account for plaintiff's need to lie down for extended periods each

day or plaintiff's problems with new situations, concentration, and working cooperatively with others.   These alleged limitations are substantiated by plaintiff's treating physicians, Dr. Grote and Dr. Risk.

The ALJ gave "little weight" to the opinions of Dr. Grote and Dr. Risk.   As previously explained, the court disagrees with the ALJ's evaluation of the treating physicians' opinions and, therefore, finds that the ALJ's RFC assessment is not supported by substantial evidence.   This, in turn, means that the hypothetical question posed to the vocational expert cannot elicit testimony to support the defendant's burden at step five because the question does not precisely state plaintiff's impairments and limitations. Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991).

Ability to perform other work

Only one occupation was given by the vocational expert as an example of substantial gainful employment which plaintiff was capable of performing under the limitations stipulated by the ALJ. The vocational expert estimated that there were 300 such jobs in the State of Kansas which would allow someone to work with a sit/stand option.  (Tr. 512). Plaintiff contends that he qualifies for disability benefits given that the occupational base available to him has been so significantly eroded.   The Tenth Circuit has stated that a number of factors should be considered in determining whether work exists in significant numbers for a claimant.  Trimiar

14

v. Sullivan, 966 F.2d 1326, 1330 (10th Cir. 1992).  Those factors include:  the level of disability, the reliability of the vocational expert's testimony, the distance claimant is able to travel to a job, the isolated nature of the type of work, and the types and availability of work.  Id.

Our review of the record indicates that the ALJ did not consider all of these factors before concluding that a significant number of jobs were available for plaintiff's employment.  We believe this is grounds to reverse and remand defendant's decision to deny benefits.  See Allen v. Barnhart, 357 F.3d 1140, 1144-45 (10th Cir. 2004).

CONCLUSION

Plaintiff's application for benefits has been pending for a considerable period of time.  The court believes the record justifies an award of benefits and the court does not believe that a remand for the purpose of further development or consideration of the record would serve a useful purpose.  Therefore, the court shall reverse and remand this case to defendant for the immediate award of benefits from a date consistent with plaintiff's claim of disability and application for benefits.

**IT IS SO ORDERED.**

Dated this 22nd day of October, 2007 at Topeka, Kansas.

s/Richard D. Rogers
United States District Judge

15